```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
                                    :
DUANE M. OVERHOLT
                                    :
   v.                               :   Civil Action No. DKC 13-3097
                                    :
LANDCAR MANAGEMENT, LTD, et al.
                                    :
```

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of contract case is a motion for summary judgment filed by Defendants Landcar Management, Ltd., the Entities Comprising the Larry H. Miller Group of Automotive Companies trading as the Larry Miller Auto Group, Auto Village Motors, Inc., Larry H. Miller Corporation – Englewood, and Larry H. Miller Corporation – Colorado, Inc. (collectively, "Defendants"). (ECF No. 62). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendants' motion for summary judgment will be granted.

**I.   Background**

   **A.   Factual Background**

Unless otherwise noted, the following facts are undisputed. Duane M. Overholt ("Mr. Overholt" or "Plaintiff") is a "consultant to auto dealers[hips] as well as to consumers and to former employees." (ECF No. 62-6, at 3, Overholt depo.). Larry

H. Miller Group owns fifty-six (56) automobile dealerships which collectively operate under the trade name Larry Miller Auto Group.  (ECF No. 55 ¶¶ 2-4).  Defendants are headquartered in Sandy, Utah and are managed by Landcar Management, Ltd.

Plaintiff is self-employed and also controls and operates Stop Auto Fraud, "an organization [or website] that basically helps consumers and former employees acquire access to the legal profession."  (*Id.* at 3-4; *see also* ECF No. 62-7, website screenshot).  Plaintiff explains his trade as follows:

> A: When this first started, consumers -- we were assisting consumers to understand what happened to them.  We weren't trying to give them a legal basis or to assist them to find legal remedies to their claims.  It was to understand what they did.  Once they understood that, then they understood that they could possibly recover, okay?  And at that point we would help them acquire information, tell them how they can get their documents and their records and how they can ask for those and how they could have an outside source look at their cars, such as a body shop or an entity that would give them evaluations.
>
> At that point, once they had those documents and records that they had themselves, they could take them to an attorney and then have that attorney help them; but we found that most attorneys did not understand the auto industry at all.  So we found ourselves in a position where we started having to help attorneys understand the paper trail, the document trail; and once they were able to do that, they were able to make a legal conclusion.  So it was actually assisting them to make a decision

>     and assisting the consumer to get the right
>     documents and records.

(ECF No. 62-6, at 6-7).

In early 2007, Plaintiff was contacted by numerous consumers and employees regarding Larry Miller Auto Group. (ECF No. 62-6, at 14-15).  Sometime in 2007, Plaintiff received correspondence from Bryant Henrie, operations manager for the Larry Miller Group of companies with oversight over Defendants' dealership operations in multiple states, asking "if we [would] open up a dialogue to better assist the Larry Miller organization."  (*Id.* at 18).  On March 17, 2007, Plaintiff and Larry H. Miller Management Company entered into a Retainer Agreement ("the 2007 Consulting Agreement").  (ECF No. 62-4; *see also* ECF No. 62-6, at 20).  The 2007 Consulting Agreement provides, in relevant part:

>     [T]he Party[1] has requested [Mr.
>     Overholt] to assist in the development of
>     materials for the actual or potential use in
>     selling, financing vehicles for sale AND
>     ASSIST IN A SET OF GUIDELINES THAT WILL HELP
>     Party comply with federal and state
>     compliance laws, specific in nature; the
>     truth and lending statutes in the state of
>     Utah; and [Mr. Overholt] has agreed to so[.]

(ECF No. 73-3, at 2).  The 2007 Consulting Agreement states that it "will begin when signed and dated, and will end when service

---

[1] Throughout the 2007 Consulting Agreement, Larry H. Miller Management Company is referred to as "Party." (ECF NO. 25-1, at 1).

3

is provided to the Party." (*Id.* at 3). More facts regarding the 2007 Consulting Agreement will be included in the analysis section.

On June 10, 2008, Plaintiff was contacted by Beth Busick ("Ms. Busick") by telephone regarding her grievances against one of Larry Miller's dealerships where she was employed. Ms. Busick subsequently followed up with an email. (ECF No. 73-7, at 2 ("I would like your help pertaining to my situation that I explained to you in our telephone conversation this morning.")). At the time, Ms. Busick was employed as the Dealership Finance Director by Larry H. Miller Nissan in Colorado. (*Id.*). Mr. Overholt flew out to Denver, Colorado to meet with Ms. Busick. (ECF No. 73-8). Mr. Overholt testified during his deposition that during their meeting, she provided him with "documents that she had taken from the Larry Miller Nissan dealership in Denver," purportedly showing wrongdoing at the dealership. (ECF No. 62-6, at 34, Overholt depo.). Mr. Overholt believed that some of the documents were falsified by Ms. Busick. (*Id.*).

At some point after his meeting with Ms. Busick, Mr. Overholt met with Pat Kroneberger, the Senior Vice President with responsibility for managing the district that includes Nissan of Denver, and Tom Mayrose, the dealership manager who at the time was responsible for day-to-day operations of Nissan of Denver, to discuss the Beth Busick documents. On June 20, 2008,

Mr. Overholt accompanied Ms. Busick to the Nissan dealership, where she was presented with a termination agreement. (See ECF No. 62-15, at 18). Initially, Ms. Busick was dissatisfied with the terms of the agreement. Mr. Overholt informed Larry Miller that she wanted $30,000 in severance pay. (*Id.* at 20). Ultimately, Ms. Busick executed a termination agreement and was paid $30,000 in severance. (ECF No. 62-14, at 6-7). Ms. Busick believed that Mr. Overholt "negotiated" the $30,000 on her behalf, although Plaintiff disputes this point. (*Id.*).

On January 29, 2010, Mr. Overholt and Defendants signed a second consulting agreement ("2010 Consulting Agreement"). (ECF No. 73-15). The contract was entered into between Mr. Overholt and Robert Tingey, an attorney representing Landcar Management, Ltd. and each of the entities comprising the Larry H. Miller Group of Automotive Companies. The 2010 Consulting Agreement states that "[i]t is understood and agreed that attorney is acting as a direct agent of the Larry Miller Auto Group" (*id.* at 2), and "specifically agrees to be a[n] agent of the Larry Miller Auto Group liable for payment of all monies due and owing to [Mr. Overholt] under this Agreement" (*id.* at 3). It further provides that it is an extension of previous agreements between Mr. Overholt and Larry Miller Auto Group. The 2010 Consulting Agreement provides, *inter alia*, that Mr. Overholt is "a specialized service provider [who] restricts his activities to

5

providing attorneys with support services specific to automotive consumer fraud issues. Services include but are not limited to the review, preparation and presentation of legal documentation, facts, figures, and opinions; expert trial testimony; deposition preparation and assistance; and assistance with affidavit preparation." (*Id.* at 2). The 2010 Consulting Agreement further states:

> Unless otherwise agreed to in this agreement, the Attorney [Mr. Tingey] agrees to pay [Mr. Overholt] a non-refundable fee equal to $3000.00 to keep all parties under contract for a 5 year period. It is clearly understood that this AGREEMENT IS FOR THE PURPOSE AND TIME RELATED TO, REVIEW AND DEFENSE OF ANY AND ALL LEGAL ACTS SUBMITTED AGAINST THE LARRY MILLER Auto Group.

(*Id.* at 3) (emphasis in original).

In April 2010, Ms. Busick complained to the Colorado Office of Attorney Regulation Counsel ("OARC"), alleging that Mr. Overholt had represented her as her "attorney" during the 2008 meeting with the Nissan dealership, negotiated on her behalf, and gave her legal advice. (ECF No. 62-14, at 10); (*see also* ECF No. 62-26). OARC subsequently conducted an investigation.

On December 15, 2010, the OARC filed a Petition for Injunction against Mr. Overholt, requesting that he be enjoined from the unauthorized practice of law (hereinafter, "the UPL Proceeding"). (ECF No. 62-34). On April 16 through 18, 2013, the Supreme Court of Colorado held a hearing on the UPL charges

through its Presiding Disciplinary Judge ("PDJ"). On June 11, 2013, the PDJ issued his Report of Hearing Master Pursuant to C.R.C.P. 236(a) recommending that the Supreme Court of Colorado find that Mr. Overholt did not engage in the unauthorized practice of law. (ECF No. 62-35) On July 12, 2013, having reviewed the PDJ's written opinion, the Colorado Supreme Court issued the following order:

> IT IS ORDERED that the Colorado Supreme Court finds the Respondent, DUANE OVERHOLT, D/B/A STOP AUTO FRAUD did not engage in the unauthorized practice of law.
>
> IT IS FURTHER ORDERED that the Colorado Supreme Court waives any fines, restitution or costs associated with this case.

(ECF No. 62-36).

On October 3, 2013, Defendants gave Plaintiff notice that they were cancelling both the 2007 and 2010 Consulting Agreements. (ECF No. 73-12).

**B. Procedural Background**

Plaintiff filed a complaint in the Circuit Court for Montgomery County on April 15, 2013. Defendants removed the action to this court on October 18, 2013. (ECF Nos. 1 & 2). Plaintiff filed an amended complaint on December 9, 2013, alleging the following causes of action: breach of contract

(counts I and V);[2] breach of the implied covenant of good faith and fair dealing (count II); wrongful involvement in litigation (count III); defamation (count IV); and malicious use of process (count VI). (ECF No. 25).

After the parties completed discovery, Defendants moved for summary judgment on October 3, 2014. (ECF No. 62). Plaintiff opposed the motion (ECF No. 73), and Defendants replied (ECF No. 76).

## II. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Once a properly supported motion for summary judgment is filed, the nonmoving party is required to make a sufficient showing on an essential element of that party's claim as to which that party would have the burden of proof to avoid summary judgment. *Celotex,* 477 U.S. at 322–23.

---

[2] Although Plaintiff labels count V of his amended complaint as a "breach of contract" claim, the allegation in that count states that Defendants owed Plaintiff a duty of good faith and fair dealing, which they breached by "turning around and lying to OARC to lead it to believe Overholt had been working not for them but for Busick." (ECF No. 25 ¶ 58).

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not

sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

**III. Analysis**

Defendants moved for summary judgment on all the counts in the amended complaint.  In his opposition to the motion for summary judgment, Plaintiff states:

> Defendants recently amended their answer and invoked as an affirmative defense an absolute judicial privilege.  *This privilege appears to bar tort claims, including defamation, against them.*  Contrary to Defendants' assertions, Plaintiff has ample incontrovertible and admissible evidence of the precisely false and defamatory statements Plaintiff alleges Defendants made to the Colorado's Office of Attorney Regulat[ion] Counsel. . . . *However, the Court need not review them or consider their admissibility in connection with the instant motion, as the defamation claim itself appears barred by the aforementioned newly asserted affirmative defense.*

(ECF No. 73, at 1) (emphases added). Plaintiff concedes that absolute judicial privilege bars the defamation claim. Plaintiff does not respond at all to the valid arguments made in Defendants' motion for summary judgment regarding his claims for wrongful involvement in litigation, malicious use of process, and breach of the implied covenant of good faith and fair dealing. For instance, as Defendants argue, there is no independent cause of action for breach of the implied covenant of good faith and fair dealing in Maryland and, in any event, Plaintiff has provided no evidence that Defendants prevented him from performing his obligations under the contract. *See Mount Vernon Props., LLC v. Branch Banking And Trust Co.*, 170 Md.App. 457, 471-72 (2006). Furthermore, the bases for Defendants' motion for summary judgment on the remainder claims also are well taken. Accordingly, summary judgment will be entered on these claims.

The amended complaint asserts two counts for breach of contract. The breach of contract claim in count I cites the January 2010 Consulting Agreement and states:

> 43. Pursuant to Overholt's consulting agreement with Defendants, Defendants are obliged to reimburse him for the expenses and fees, including attorneys['] fees, and to pay him for time he incurs in connection with any matter under his consulting agreement, which includes matters related to defense of any claims of illegal acts

11

> against the "Larry Miller Auto Group[.]" *See*, Exhibit B.
>
> 44. Overholt incurred [] nearly Two Hundred Fifty Thousand Dollars ($250,000.00) in legal fees and out of pocket expenses *in defending himself* against the Civil Injunction Proceeding.
>
> . . .
>
> 46. Defendants failed to pay Overholt for his time or for the costs and fees incurred by Overholt in connection with that civil proceeding and, by so failing, breached their agreement with Overholt.

(ECF No. 25 ¶¶ 44-46) (emphasis added). In short, Plaintiff seeks reimbursement for the attorneys' fees he allegedly incurred in defending himself in the UPL Proceeding as a result of his dealings with Beth Busick in June 2008.

To establish a claim for breach of contract in Maryland,[3] a plaintiff must prove that a contractual obligation exists and that the defendant has breached that obligation. *See Continental Masonry Co. v. Verdel Constr. Co.*, 279 Md. 476, 480 (1977). Plaintiff does not dispute that there were only two written contracts between the parties – the 2007 Consulting Agreement and the 2010 Consulting Agreement. Defendants briefly suggest in their initial motion for summary judgment that the

---

[3] The parties agree that Maryland law applies to the breach of contract claims. The 2007 Consulting Agreement provides that Maryland law applies. (ECF No. 73-3, at 5, § 11). The 2010 Consulting Agreement does not contain a choice of law provision, but states that "[t]his Agreement shall be deemed to have been executed . . . [in] Maryland." (ECF No. 73-15, at 3, § 8).

12

2007 Consulting Agreement had expired and was not operative during the Busick events in June 2008, which culminated in the UPL Proceeding. (ECF No. 62-1, at 34). Plaintiff disagrees, arguing, without any citation to legal authority, that "[w]hen the parties executed the 2010 agreement, each contemplated that it was an extension of previously executed agreements. This action would *revive* any contract that would have ended. . . . The revival of the 2007 contract would require Defendants to abide by the 2007 and 2010 contractual terms in regards to Plaintiff's dealings with Busick." (ECF No. 73, at 16) (emphasis added). The court need not address the merits of this argument because, as will be seen, no contractual provision in either contract required Defendants to indemnify Mr. Overholt in the UPL Proceeding. (ECF No. 62-1, at 35-36).

Plaintiff relies on several provisions in the 2007 and 2010 Consulting Agreements to hold Defendants liable for his legal expenses in connection with the UPL Proceeding. First, Plaintiff relies on Section 4 of the 2010 Consulting Agreement as showing that Defendants are obligated to indemnify him for the UPL Proceeding:

> In no event, shall the liability of [Mr. Overholt] *under this agreement*, whether under a theory of contract or tort exceed the sum and total of monies paid to it, and [Mr. Overholt] shall not be liable for any special, incidental or consequential damages, whether incurred through the agency

13

>           of [Mr. Overholt] or any other party, and
>           whether or not [Mr. Overholt] has knowledge
>           that such damages might be incurred. [Mr.
>           Overholt] shall incur no liability for
>           delays or losses of documents by contract
>           service providers, the postal services, or
>           any other carrier.

(ECF No. 73-15, at 3, § 4) (emphasis added). The 2007 Consulting Agreement contains the same provision in Section 6. (ECF No. 73-3, at 4, § 6). This provision limits Mr. Overholt's liability under the Agreement *to Defendants*, absolving him from liability for any special, incidental, or consequential damages incurred by Defendants. Defendants do not attempt to impose liability against Plaintiff under the 2007 or 2010 Consulting Agreement under any theory. Instead, separate proceedings were initiated against Mr. Overholt by OARC for his alleged unauthorized practice of law and Mr. Overhelt incurred attorney's fees in connection with that third-party claim. "In general, courts will not read limitations of liability provisions to cover situations beyond their express terms." *Marriott Corp. v. Chesapeake & Potomac Telephone Co. of Maryland*, 124 Md.App. 463, 475 (1998). The above provision simply does not apply to the UPL Proceeding. The court will not read an indemnification provision into either contract where, as here, none exists.

Plaintiff also cites Section 8 of the 2010 Consulting Agreement and Section 10 of the 2007 Consulting Agreement as

obligating Defendants to indemnify him for the UPL Proceeding. Section 8 of the 2010 Consulting Agreement states:

> The Attorney specifically agrees to be a[n] agent of the Larry Miller Auto Group liable *for payment of all monies due and owing to [Mr. Overholt] under this Agreement*, and for all expenses that [Mr. Overholt] *may incur in connection with enforcement of its rights or any other matter hereunder*, including Attorney's fees.

(ECF No. 73-15, at 3, § 8) (emphases added). Similarly, Section 10 of the 2007 Consulting Agreement provides:

> The Party specifically agrees to be personally liable for payment of all monies due and owing to [Mr. Overholt] under this Agreement. Each party hereto shall be liable for all expenses that the other may incur in connection with enforcement of its rights or any other matter hereunder, including attorney's fees.

(ECF No. 73-3, at 4, § 10). Plaintiff emphasizes the "any other matter" term and argues that because the "UPL proceeding arose out of Plaintiff's fulfillment of his contracted for duties[,] . . . Plaintiff should be indemnified for enforcing Defendants' rights under the separate contracts." (ECF No. 73, at 20). This argument is misplaced and ignores the plain language of these provisions. Neither Section 8 of the 2010 Consulting Agreement nor Section 10 of the 2007 Consulting Agreement indemnify Mr. Overholt for third-party lawsuits. Both clauses impose liability on either Larry H. Miller Management Company (under the 2007 Consulting Agreement) or Mr. Tingey as agent

15

(under the 2010 Consulting Agreement) for payment of all monies due to Mr. Overholt for his services.  The provisions further provide that each party is liable for any expenses incurred by the other party in enforcing the agreements themselves.  As Defendants argue, "[these] provision[s] would apply, for example, if Defendants had not paid Overholt for his actual services spelled out in agreement, requiring Overholt to bring suit.  However, th[ese] provision[s] in no way obligate[] Defendants to indemnify Overholt for the fees he incurred in the UPL Proceedings because Overholt was not enforcing the 2010 Consulting Agreement [or the 2007 Consulting Agreement] in the UPL Proceedings."  (ECF No. 62-1, at 35).

Plaintiff further argues:

> Defendants agreed to limit Plaintiff's liability and imposed a strict confidentiality agreement on Plaintiff.  In fulfilling and as a result of his contracted duties in helping Defendants head off and end potential legal actions against them, Plaintiff was the subject of costly Unauthorized Practice of Law Proceedings.  These provisions impose a duty on Defendants to indemnify Plaintiff.

(ECF No. 73, at 18).  The fact that the consulting agreements contained confidentiality clauses does not give rise to liability for failing to indemnify Plaintiff when nothing in the contracts required Defendants to do so.

Based on the foregoing, Plaintiff has not established any breach by Defendants of either agreement and judgment will be entered in favor of Defendants on the breach of contract claims.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted. A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge
